**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CHRISTY A. JONES., on behalf of
S.R.S,**
              **Plaintiff,**

**v.**                                                    **CASE NO. 3:09-cv-00676**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

              **Defendant.**

**MEMORANDUM OPINION**

        This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for children's Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos. 11 and 15).  Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 5 and 6).

        The Court has fully considered the evidence and the arguments of counsel.  For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.      PROCEDURAL HISTORY**

        Plaintiff, S.R.S. (hereinafter referred to as "Claimant"), through her mother, Christy

A. Jones,[1]  originally filed an application for children's SSI benefits on February 26, 2003, alleging low birth weight.  Claimant received benefits until June 1, 2005 when benefits ceased due to Claimant's medical improvement. (Tr. at 14).  Claimant missed the deadline to appeal the cessation of benefits.  Accordingly, Claimant, through her mother, filed a second application for SSI benefits on September 26, 2005, alleging that as of that date Claimant was disabled, because she was "premature, very underweight and height for her age.  She has problems walking.  She has behavior problem." (Tr. at 125).  This application was denied initially on March 22, 2006, and upon reconsideration on December 27, 2006. (Tr. at 14).  Claimant timely requested a hearing, which took place on July 16, 2008 before the Honorable James S. Quinlivan, Administrative Law Judge ("ALJ").  (Tr. at 303-325).  A supplemental hearing was held on November 19, 2008 to update the status of Claimant's condition.  (Tr. at 326-332).  By decision dated January 15, 2009, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 14-26).  The ALJ's decision became the final decision of the Commissioner on April 17, 2009, when the Appeals Council denied Claimant's request for review.  (Tr. at 5-7).  On June 16, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

## II.    SUMMARY OF ALJ'S DECISION

A child is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or

---

[1] Ms. Jones was formerly known as Christy Barnette and Christy Smith.  Claimant has also been known by the surname Barnette.

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations require the ALJ to determine a child's disability using a three step sequential evaluation. 20 U.S.C. § 416.924. At the first step, the ALJ must determine whether the child is engaged in substantial gainful activity. *Id.* If the child is, he or she is found not disabled. *Id.* If the child is not, the second inquiry is whether the child has a severe impairment. *Id.* An impairment is not severe if it constitutes only a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." *Id.* If a severe impairment is present, the third and final inquiry is whether such impairment meets or medically equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 ("Appendix 1"). *Id.* Although an impairment may not, on its face, meet or medically equal a listing, it is considered to be of listing-level severity when the impairment is ***the functional equivalent*** of a listing. 20 C.F.R. § 416.926a (emphasis added). If the claimant's impairment meets, medically or functionally equals a listing in Appendix 1, the claimant is found disabled and is awarded benefits. 20 U.S.C. §§ 416.924 and 416.926a. If it does not, the claimant is found not disabled.

To determine functional equivalence, the regulations require the ALJ to evaluate the limitations resulting from the child's impairment under six broad domains of functioning, including:

(1) Acquiring and using information;
(2) Attending and completing tasks;
(3) Interacting and relating to others;
(4) Moving about and manipulating objects;
(5) Self-care; and
(6) Health and physical well-being.

*Id.* at 416.926a(b)(1); *SSR* 09-1p.  If the child has "marked" limitations in two of the six domains, or "extreme" limitations in one of them, the child's impairment will functionally meet a listing.  *Id. at* 416.926a(d).  "This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings."  *SSR* 09-1p. The SSA calls this technique the "whole child" approach.  *Id.*

In this particular case, the ALJ determined that Claimant satisfied the first inquiry, because she had not engaged in substantial gainful activity.  (Tr. at 17, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of recurrent upper respiratory infection and attention deficit hyperactivity disorder ("ADHD") versus oppositional defiant disorder ("ODD"). (Tr. at 17, Finding No. 3).  At the third and final inquiry, the ALJ concluded that Claimant's impairments did not meet and did not medically or functionally equal the level of severity of any listing in Appendix 1.  (Tr. at 18-26, Finding Nos. 4 and 5).   Therefore, Claimant was not under a disability as defined in the Social Security Act and was not entitled to benefits.  (Tr. at 26, Finding No. 6).

### III.   <u>SCOPE OF REVIEW</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In *Blalock v. Richardson,* 483 F.2d 773 (4th Cir. 1972), the Fourth Circuit Court of Appeals defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

## IV.   **CLAIMANT'S BACKGROUND**

Claimant was five years old at the time of the administrative hearing and attended the local kindergarten. (Tr. at 328.) She was born prematurely in 2003 and was hospitalized at Cabell Huntington Hospital for several months thereafter. (Tr. at 180). Claimant lived with her mother and stepfather, both of whom were disabled. (Tr. at 306-307). Claimant was the only child in the household. *Id.*

## V.   **CLAIMANT'S CHALLENGES TO THE COMMISSIONER'S DECISION**

Claimant asserts that the Commissioner's decision is not supported by substantial evidence, because the ALJ erred in two ways. First, he improperly disregarded the findings of James M. Lewis, M.D., who was Claimant's treating physician for her complaints of ADHD and ODD. (Pl. Br. at 5). Second, Claimant argues that the ALJ ignored Claimant's

height and weight, which were below the 5th percentile for her age, and consequently approached Listing 100.02(B) of Appendix 1. Claimant emphasizes that her "growth impairment" was the basis for her earlier award of SSI benefits and suggests that this impairment continues to constitute a recognized disability. (Pl. Br. at 6).

To the contrary, the Commissioner contends that the ALJ properly declined to adopt Dr. Lewis' severity assessment of Claimant's functional limitations, because that assessment was based on the subjective statements of Claimant's mother, rather than the objective medical evidence. (Def. Br. at 9-11). Furthermore, the Commissioner argues that none of Claimant's impairments, either taken singly or in combination, met or equaled a listing; therefore, the ALJ was correct in finding that Claimant was not disabled. (Def. Br. At 11-17).

## VI.   **MEDICAL DOCUMENTATION**

The Court has reviewed all evidence of record, including the medical documentation. To the extent medical information is relevant to the issue of whether the Commissioner's decision is supported by substantial evidence, the Court addresses it in detail in the discussion below.

In summary, however, Claimant was born prematurely in February 2003. Since birth, she received general pediatric care from the physicians of University Pediatrics; most frequently from Dr. Jay Naegele and Dr. Jenna Dolan. In February 2006, Dr. James Lewis, a neurodevelopmental disabilities specialist with University Pediatrics, assessed Claimant for behavioral problems at the request of her parents. Dr. Lewis evaluated and treated Claimant on approximately three occasions before the administrative hearing in July 2008.

Ancillary to her applications for SSI benefits, Claimant underwent evaluations by Dr.

Drew Apgar, a family medicine specialist, and Lisa Tate, M.A., a psychologist.  In addition,

the SSA had a Childhood Disability Evaluation completed by a non-examining medical

source, Dr. James Binder, a child and adolescent psychiatrist who was also affiliated with

University Pediatrics.

## VII.   DISCUSSION

Claimant contends that her impairments, including her recurrent upper respiratory

infections, ADHD, and ODD, in combination, met or medically equaled an impairment

listed in Part B of Appendix 1.  Likewise, she argues that her small stature and low weight

met or medically equaled the listed impairment described in § 100.02(B) of Appendix 1.  As

an alternate argument, Claimant posits that the functional limitations of her ADHD and

ODD, when combined with the functional limitations of her recurrent upper respiratory

infections, are of sufficient severity to functionally equal a listed impairment in Appendix 1.

### A.   Impairments that Allegedly Met or Medically Equaled a Listed Impairment.

#### 1.   *Growth Impairment*

Part B of Appendix 1 contains medical criteria for the evaluation of impairments of

children under age 18.  Part B includes 14 categories of disease processes or medical

disorders that have been assigned severity criteria sufficient to create the presumption of

disability in children.  Section 100.00 addresses the disorder of "Growth Impairment."

Paragraph B of § 100.00 states the following: "[D]eterminations of growth impairment

should be based upon the comparison of current height with at least three previous

determinations, including length at birth, if available."   In addition, height and weight

should be plotted on standard growth charts, such as those derived from the National

Center for Health Statistics. *Id.*  Finally, the adult heights of the child's natural parents and siblings should be furnished to identify those children "whose short stature represents a familial characteristic rather than the result of a disease.  This is particularly true for adjudication under 100.02B."  *Id.*

Section 100.02B states severity criteria for a growth impairment "considered to be related to an additional medically determinable impairment."  To meet the criteria of this section, the Claimant must experience a "[f]all to, or persistence of, height below the third percentile."  At the outset, Claimant cannot meet this Listing, because there is no evidence that her height is in any way related to her medically determinable impairments of ADHD, ODD, and recurrent upper respiratory infections.   Apart from this fact, Claimant's height has never fallen to, nor persisted at, a level below the third percentile.  To qualify for benefits on account of a listed impairment contained in Appendix 1, a claimant must present medical findings that meet **all** elements of the listing for that impairment.  *Sullivan v. Zembly,* 493 U.S. 521 (1990).

At birth, Claimant's length was measured at the 16th percentile.  (Tr. at 180).  At twenty seven months of age, her height was 34 inches, which placed her at approximately the 40th percentile for girls her age.  (Tr. at 196).  At thirty four months, her height was measured at 34 ¾ inches, which placed her in the 10th percentile.  (Tr. at 270).  However, two months later, her height was measured at 35 ¾ inches, placing her at the 23rd percentile.  (Tr. at 215).  At age five years and two months, Claimant was 41 ¾ inches in height, which corresponded to the 38th percentile for girls in her age group.[2]  (Tr. at 258).

---

2  All of these percentiles come from the applicable National Center for Health Statistics: NCHS Growth Charts for Girls.

The record further reflects that Claimant's mother is 5 foot 6 inches tall, but her biological father was only 5 foot 7 inches tall. (Tr. at 137). According to the National Center for Health Statistics, the average height for an adult male in the United States is 5 foot 9.2 inches. When the height of Claimant's father is plotted on the National Center for Health Statistics: NCHS Growth Chart for Boys Age 2-20, his height falls within the 25th-30th percentile range. The below average height of Claimant's father lends support to Dr. Drew Apgar's conclusion that "tracing [Claimant's] height and weight on a growth chart simply suggests low normal developmental patterns," (Tr. at 225), rather than a growth impairment. Accordingly, based upon the criteria contained in Listing 100.02B, Claimant's small stature did not meet, nor medically equal, the requisite severity criteria associated with the listed growth impairment disorder.

### 2.    *Respiratory Infections, ADHD, and ODD*

Likewise, an appraisal of Claimant's documented respiratory and mental impairments (ADHD and ODD) falls short of corroborating Claimant's allegation that, taken in combination, these impairments meet or medically equal the severity requirements of a body system listing contained in Appendix 1. Claimant does not specify to which listed body system she refers in her brief; however, the intensity and severity of her impairments have not been established to the degree that they meet or medically equal the criteria contained in either the section on respiratory system disorders or the section on mental disorders. These are the only listed body systems that appear relevant to Claimant.

Claimant's mother testified in the November 2008 administrative hearing that since starting school in the Fall of 2008, Claimant's "immune system has failed her body." (Tr. at 329). She stated that Claimant was in the doctor's office four times in October, and the

doctor he had placed Claimant on a nebulizer, which she allegedly used four times a day for asthma-like symptoms. (Tr. at 329-330). Claimant's mother further testified that Claimant had been treating with Dr. Lewis for her ADHD and ODD for two years. *Id.* She indicated that as of November 2008, Claimant suffered from "asthma, upper respiratory infections, ear infections, and behavioral problems." (Tr. at 331).

The records reflect that on August 20, 2008, Claimant presented to University Pediatrics for a well-child visit. (Tr. at 299-302). On this visit, Claimant was reported to have normal sleep patterns and normal eating habits. She was starting kindergarten and demonstrated both the ability to separate from her parents and to get along with other family members. *Id.* She displayed appropriate behavior and had positive responses to all questions regarding her growth and development. Her physical examination was completely normal. *Id.* Her lungs were clear, without evidence of wheezing, rhonchi, or decreased breath sounds. Claimant had a history of allergies and acute pharyngitis (sore throat). *Id.* Dr. Naegele assessed Claimant as follows: "Normal routine history and physical preschool (3-6); constipation; attention-deficit hyperactivity disorder." Claimant was prescribed Claritin syrup, a laxative, and her routine immunizations. *Id.* On September 18, 2008, Claimant returned with complaints of vomiting, stuffy nose, stomach pain, headache, and a sore throat. (Tr. at 297-298). Claimant had a negative strep test and was diagnosed with gastroenteritis. *Id.* Four days later, on September 22, 2008, Claimant returned with an increase in her respiratory symptoms. (Tr. at 295-296). Her lungs were noted to be clear to auscultation, but her nasal cavities revealed a thick nasal discharge. *Id.* Dr. Naegele diagnosed Claimant with "acute sinusitis" and ordered a ten day course of amoxicillin. (Tr. at 296). No additional records were submitted, including records for the

month of October.

As far as evaluating the severity of Claimant's recurrent respiratory infections, the ALJ did not have objective medical evidence indicating that Claimant had "marked" or "severe" limitations related to this impairment. For example, Claimant did not present any documentary evidence or testimony to demonstrate that she had undergone pulmonary function studies or required mechanical ventilation, oxygen supplementation, inpatient hospitalizations, or courses of corticosteroids. She did not have a worrisome chest x-ray, or clinical evidence of chronic wheezing, recurrent asthma attacks, hypoventilation, or chronic respiratory distress. There were no abnormal arterial blood gases, and the few pulse oximetry readings contained in the record were normal. The use of a nebulizer, even four times a day, does not meet or medically equal any criteria contained in the section on respiratory illnesses. See *Part B to Appendix I to Subpart P, § 103.01.* As the ALJ aptly acknowledged in his decision, in the absence of at least some of these symptoms or findings, Claimant simply cannot establish listing-level severity. Additionally, there is no evidence in the record to suggest that Claimant's mental disorders caused, contributed, exacerbated, or interplayed in any manner in the limitations secondary to her recurrent respiratory infections. Accordingly, these impairments in combination did not meet or medically equal the severity criteria of a listed respiratory condition.

Part B, Section 112.00 describes the categories of mental disorders that have been assigned disability criteria. See *Part B to Appendix I to Subpart P, § 112.00.* The listings for children are arranged in eleven diagnostic categories. Only two of the categories, § 112.01, entitled *Organic Mental Disorders,* and § 112.11, entitled *Attention Deficit Hyperactivity Disorder*, have any arguable link to Claimant's condition. Turning first to §

112.01, Claimant is unable to establish the applicability of this section, because she has produced no evidence of the threshold criteria contained in the introductory paragraph; that being, evidence of an organic abnormality judged to be etiologically related to the alleged affective changes or abnormal mental state. An organic abnormality is a dysfunction of the brain caused by a specific organic factor, which is identified through history, physical examination, or laboratory tests. See *Part A to Appendix I to Subpart P, at § 12.02.* None of the medical records in evidence propose the existence of an organic mental disorder. To the contrary, the thorough psychological testing and evaluation performed on Claimant failed to identify any signs or symptoms of such a problem. (Tr. at 272-276).

The ALJ stated in his decision that he compared the findings related to Claimant's ADHD and ODD to the criteria of Listing 112.11 of Appendix 1, which undoubtedly was the appropriate comparison.[3] The ALJ found that references in the record regarding Claimant's behavior at school and her examination by Dr. Apgar did not reflect the severity of symptoms sufficient to meet the listing. In fact, § 112.11 requires "medically documented" findings of marked inattention; marked impulsiveness; and marked hyperactivity, as well as marked impairment in two of four functional criteria contained in the listing on Organic Mental Disorders. A review of the transcript demonstrates that the ALJ had substantial evidence upon which to reach this conclusion. The anecdotal reports of Claimant's mother were the only evidence in the record that Claimant had marked hyperactivity or misbehavior. The clinical notes from various health care providers documented a

---

[3] According to the Mayo Clinic's website, ODD often occurs with ADHD. When ADHD is effectively treated with medications, the symptoms of ODD may significantly improve. MayoClinic.com, Oppositional Defiant Disorder, updated 11/5/10.

cooperative, calm, and friendly child.  For example, the speech pathologist, who tested Claimant when she was three years of age, described Claimant as "cooperative for testing." (Tr. at 213-214).  She found that Claimant's raw scores on the speech language evaluation placed her at the age-equivalent of 2.9 years, reflecting only a very mild delay.  *Id.* Similarly, in his initial examination of Claimant in February 2006, Dr. James Lewis described her as "cooperative and quiet through most of the evaluation." (Tr. at 215).  He found her "attention span, hyperactivity" to be "probably normal for her age." *Id.*  He felt her oppositional behavior was "normal toddler behavior" and might be related to the family situation.  *Id.*

In June 2006, Dr. Drew Apgar examined Claimant and stated, "Claimant's mental status was essentially normal for her age considering past medical history. . . Claimant was able to maintain concentration and focus throughout the examination.  Claimant interaction and adaptation were considered appropriate to the needs of the examination for her age."  (Tr. at 234).  Lisa White, the psychologist retained by the SSA to evaluate Claimant, also documented that Claimant "sat quietly during her mother's interview." (Tr. at 275.)

These descriptions of Claimant's behavior and demeanor do not support a finding that Claimant's mental impairments met or medically equaled the severity of the listing criteria.  Moreover, no evidence exists in the record upon which to conclude that Claimant's upper respiratory infections, or her treatment for them, contribute to or exacerbate her ADHD and ODD and the limitations associated with those conditions.  Therefore, the Court finds that the ALJ had substantial evidence upon which to determine that Claimant's impairments separately, and in combination, failed to meet or medically equal the criteria

of any body system listing in Appendix 1.

### B. Impairments Alleged to Functionally Equal a Listed Impairment.

Claimant next challenges the ALJ's conclusions regarding the functional limitations resulting from the combination of her severe impairments of recurrent upper respiratory infections and ADHD versus ODD.  Claimant does not allege that the ALJ failed to follow the proper process in performing the sequential evaluation.  Instead, she contends that the ALJ's conclusions were not supported by substantial  evidence; particularly, when considering that Dr. Lewis, Claimant's primary treating physician for ADHD and ODD, found Claimant to have marked limitations in four out of the six broad domains of functioning.  (Pl. Br. at 5).

Using the "whole child" approach in determining childhood disability under the functional equivalence rule, the ALJ must examine the claimant's activities, determine which domains are involved in those activities, and then rate the severity of the limitation in each affected domain.  *SSR* 09-1P.   In his decision, the ALJ reviewed Claimant's activities under each of the six functional domains and determined the severity of her limitations in each, providing an explanation for his findings.  (Tr. at 18-26).  In reaching his conclusions, the ALJ expressly rejected the opinion of Dr. Lewis, who was the only medical source that found Claimant to have "marked" limitations in two or more of the six functional domains. (Tr. at 21).  The ALJ disregarded Dr. Lewis' assessment for two reasons.  First, the ALJ felt that Dr. Lewis based his findings primarily upon the subjective statements of Claimant's mother "and not on examination or testing."  *Id.*  Second, the ALJ found Dr. Lewis' findings on the evaluation form were "clearly not consistent with the other medical evidence of record."  *Id.*

The regulations provide a framework by which the ALJ must evaluate opinion evidence.  20 C.F.R. § 416.927.  According to § 416.927, when evidence in the record, including medical opinions, is inconsistent with other evidence or internally inconsistent, the ALJ "will weigh all of the evidence."  Every medical opinion will be evaluated and given a particular weight.  The opinion of a treating source may be afforded controlling weight if the ALJ finds that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record."  *Id.*   When the ALJ does not give the treating source's opinion controlling weight, the ALJ must determine how much weight to give the opinion based upon certain factors, including:

(1)  The length of the treatment relationship;

(2)  The nature and extent of the treatment relationship

(3)  The supportability of the opinion;

(4)  The consistency of the opinion;

(5)  The area of specialty of the treating source; and

(6)  Other factors that may support or contradict the opinion.

*Id.*   Generally, the opinions of treating sources are given more weight than the opinions of other examining sources, and the opinions of examining sources are given more weight than the opinions of nonexamining sources.  *Id.*   Ultimately, the weight given to the opinion is based in large part upon its medical and diagnostic support and its consistency with other opinions and objective medical evidence.  *Id.*

In order to judge whether the ALJ acted in accordance with the regulations when he rejected Dr. Lewis' opinion, the Court must review the objective medical evidence, the

statements of persons knowledgeable of Claimant's activities, and the totality of the opinions; particularly, the data generated between September 26, 2005 and November 2008. A review of the transcripts yields the following pertinent information.

On December 20, 2005, Claimant was seen by her pediatrician for a routine visit. (Tr. at 270). Claimant's mother expressed concern about Claimant's behavior, which the pediatrician thought was "more like problems w/parenting skills." He recommended that Claimant see Dr. James Binder, but Claimant's mother indicated that she was taking Claimant to see Dr. James Lewis. *Id.*

On February 21, 2006, Claimant underwent a speech language evaluation at Holzer Medical Center. (Tr. at 213-214). Her scores placed her slightly behind her age group. Her articulation was within functional limits for her age. Her receptive language was mildly delayed, and her expressive language was mildly to moderately delayed. Claimant was noted to be cooperative throughout the testing. The speech pathologist felt Claimant's prognosis was good with direct intervention. *Id.*

On February 22, 2006, Dr. Lewis evaluated Claimant for the first time. (Tr. at 215-216). He noted that she was cooperative and quiet through most of the evaluation. His findings on Claimant's physical examination were essentially normal. He documented that "DSM-IV Criteria positive for some sym of ADHD and oppositional defiant aspects," but that there were "minimal issues for distractibility, persistence, approach withdrawal, N/P for intensity." His impression was as follows:

1) Certainly sig behavioral issues although there is some sym of attention span, hyperactivity, probably normal for her age. Will score child behavioral check list which parents have completed for us and given informational handouts on the treatments on school issues and behavioral problems.
2) Normal toddler behavior, some oppositional defiant issues, adjustment, family

situation as well.

3) Certainly some sleep problems related to mother's concerns about her brothers death during sleep.

*Id.* Dr. Lewis strongly urged counseling "through Dr. Binder or other specialists." *Id.* He did not expressly diagnose ADHD or ODD on this visit.

On May 30, 2006, Claimant's mother completed a Child Function Report at the request of the SSA. (Tr. at 146-152). In the report, Claimant's mother indicated that Claimant had no problems talking; Claimant could perform eight out of nine tasks related to "understanding and learning;" Claimant's physical abilities were not limited; Claimant's impairments did not affect her behavior with others; and Claimant could perform two out of five tasks related to self-care. *Id.* This report reflected significant improvement in Claimant's functional abilities when compared to the Child Function Report completed by Claimant's mother in June 2005. (Tr. at 161-166).

On June 23, 2006, Claimant was evaluated by Dr. Drew Apgar at the request of the SSA. Dr. Apgar noted that "Mother also reports the claimant suffers from attention deficit disorder. This was not apparent during the evaluation process today as the child was able to follow simple commands with[out] delay or inability to comprehend the meaning of each simple command."[4] Dr. Apgar's physical examination of Claimant was entirely normal. Claimant had no nasal symptoms, and her lungs were clear, with good air movement and without wheezes, rales, or rhonchi. Her pulse oximetry measured 98% on room air. Dr. Apgar concluded that Claimant's mental status was normal for her age; that she had no discernible physical impairment, but that she might have a developmental delay in speech. *Id.*

---

4  The Court concludes that Dr. Apgar's record contains a typographical error and incorrectly states "with" instead of "without." Otherwise, the sentence is illogical.

On July 14, 2006, Dr. James Binder completed a Childhood Disability Evaluation Form at the request of the SSA. (Tr. 241-246). He concluded that claimant's impairments were "not severe," because the evidence only reflected a mild speech delay and "some oppositional behaviors which were thought to be mostly normal per Dr. Lewis." He added that "Dr. Lewis, a specialist is ADHD" did not diagnose ADHD at the initial visit. *Id.*

On August 28, 2007, Dr. Lewis evaluated Claimant in follow-up. (Tr. at 264). He had not seen her for 1 ½ years. On examination, her found her growth and development to be normal and her respiratory tract to be absent any signs of illness. His impression was that Claimant had oppositional defiant behaviors with "parenting issues." He once again suggested a referral to Dr. James Binder. *Id.*

On April 11, 2008, Dr. Lewis again evaluated Claimant in follow-up. He diagnosed ADHD, oppositional defiant behavior, and an impulsive/explosive disorder. (Tr. at 258-260). Although Dr. Lewis did not explain the bases for these diagnoses, a questionnaire completed by Claimant's mother looks to be the foundation of his conclusions. His noted observations of Claimant during that visit reflected that she was alert and cooperative, with "appropriate mood and affect," without tics. *Id.* His physical examination of Claimant revealed that her nasopharynx, including tonsils, were normal and her lungs were clear to auscultation. Dr. Lewis otherwise found Claimant's development to be normal. He increased Claimant's ADHD medication and recommended behavior modification counseling. *Id.*

On August 31, 2008, Lisa C. Tate, a psychologist, performed a psychological evaluation of Claimant and completed a Childhood Functional Assessment Form. (Tr. at 272-284). Ms. Tate's evaluation included a parent interview, child observation, and the

administration of two tests, the Wechsler Preschool & Primary Scale of Intelligence and the Developmental Test of Visual and Motor Integration ("VMI"). Ms. Tate noted that Claimant had no history of recent illnesses, injuries or hospitalizations. Her current medical problems were reported as allergies. She had experienced no side effects from medication. She received treatment from Dr. Lewis for ADHD. During the parent interview, Claimant's mother reported that Claimant spent her time watching television and playing outside. Claimant had one regular playmate, but had difficulty sharing with others. On testing, Claimant's intelligence test results were in the low average range and her VMI score was 67. Both test results were considered to be valid. Ms. Tate indicated that Claimant "was friendly and cooperative . . . was persistent and required little encouragement." Claimant worked at a normal pace. Ms. Tate felt that "[r]apport was easy to establish and maintain." Ms. Tate indicated that Claimant's social functioning was within normal limits based on her interaction with staff during the evaluation. Claimant's concentration, persistence and pace were also normal. *Id.* On the Functional Assessment Form, Ms. Tate rated Claimant's communication development, gross and fine motor development, social development, personal and behavioral development, and concentration and pace to be "good." *Id.*

On September 29, 2008, Dr. James Lewis wrote a letter indicating that Claimant had ADHD and ODD. (Tr. at 288). He felt the psychological evaluation was "accurate and complete." He felt the psychologist "question[ed] appropriately the degree of impairment," and concluded that Claimant was within normal limits by psychological assessment. *Id.* Approximately two weeks later, on October 14, 2008, Dr. Lewis updated a Childhood Disability Evaluation Form that he first completed for Claimant on July 10, 2008. (Tr. at 289-294). In this form, he inexplicably evaluated Claimant as having "marked" limitation

in four out of six functional domains.  *Id.*   A limitation is "marked" in a domain when the impairment "interferes seriously with [claimant's] ability to independently initiate, sustain, or complete activities."   20 C.F.R. § 416.926a(e)(2).   Marked limitation "also means a limitation that is 'more than moderate' but 'less than extreme.'   It is the equivalent of the functioning [the SSA] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* From reviewing the supporting comments, Dr. Lewis' conclusions appeared to be based upon historical and anecdotal information provided to him by Claimant's mother.   For example, Dr. Lewis commented that Claimant's height and weight were in the 10th percentile, when his own record of April 11, 2008 documented her height to be at the 38th percentile.   He also stated that Claimant could not bathe or dress herself; she cried at school and could not make friends; she was afraid of boys.   These are all observations that he could not have made on his own.   In fact, his notations of temper tantrums and physical aggression actually contradict his personal observations of Claimant made during his office appointments.

From a review of the medical documentation and the observations of the various witnesses, the Court finds that the ALJ's rejection of Dr. Lewis' opinion on the severity of the limitations experienced by Claimant was supported by substantial evidence.   The other health care providers who examined and treated Claimant did not make findings or document observations indicating that Claimant suffered from marked limitations in function.   Moreover, Dr. Lewis' own treatment notes do not reflect such severe limitations. As indicated above, he observed Claimant being quiet and cooperative, with normal development.   He twice commented that some of Claimant's issues could be related to the family/parent situation and spent as much time counseling Claimant's parents as he did

evaluating Claimant. Claimant argues that the ALJ inappropriately speculated that comments by Claimant's mother provided the basis of Dr. Lewis' assessment on the functional evaluation form.  However, regardless of who provided the information, the factors noted on the form in support of the severity ratings simply could not have been based on the personal knowledge or observations of Dr. Lewis and were inconsistent with much of the other evidence of record.

Although a treating physician's opinion may only be disregarded if there is "persuasive contradictory evidence," when the "expert medical testimony from examining or treating physicians goes both ways, a determination in accordance with [a] non-examining, non-treating physician should be affirmed." *Hamrick v. Bowen,* 883 F.2d. 68, 1989 WL 90583 (4th Cir. 1989).  In the present case, records from both examining and non-examining sources constituted persuasive contradictory evidence to Dr. Lewis' final evaluation.  Likewise, the Functional Assessment completed by Claimant's mother did not contain information suggestive of marked limitations in two or more domains.  In addition, the assessments of Dr. Binder, a non-examining source, and Ms. Tate, an examining source, provided a solid basis for the ALJ's determination.  Dr. Binder was the specialist to whom Claimant's treating physicians, including Dr. Lewis, referred Claimant for care and treatment of her ADHD and ODD.  Dr. Binder reviewed the relevant records, including Dr. Lewis' initial office record, and did not find enough evidence to conclude that Claimant's impairments were even severe.  Certainly, the disparity between Dr. Binder's assessment of non-severe impairments and Dr. Lewis' assessment of severe impairments with marked functional limitations is vast.  When judging the persuasiveness of these opinions, the findings and observations of Ms. Tate cannot be overlooked.  Ms. Tate performed the only

complete psychological evaluation of Claimant and her conclusions, based upon her own testing and personal observations, were that Claimant was functioning well in her daily activities and was developing normally.

For these reasons, the Court finds that the conclusions of the ALJ were based upon substantial evidence; therefore, the decision of the Commissioner is appropriate.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  December 9, 2010.

Cheryl A.  Eifert
United States Magistrate Judge